UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
MONTEFIORE MEDICAL CENTER,            :
                                      :
            Plaintiff,                :
                                      :    09 Civ. 3096 (HB)
    - against -                       :
                                      :    OPINION & ORDER
LOCAL 272 WELFARE FUND, and MARK      :
GOODMAN, in his capacity as Fund Manager  :
of the LOCAL 272 WELFARE FUND,        :
                                      :
            Defendants.               :
------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**

      Montefiore Medical Center ("Montefiore") brings this action against Local 272 Welfare Fund (the "Fund") and Mark Goodman, in his official capacity as Fund Manager. Montefiore seeks payment for medical services provided to members of the Teamsters Local 272 Union. This case was the subject of an earlier Opinion and Order by this Court and an appeal before the Second Circuit. *See Montefiore Med. Ctr. v. Teamsters Local 272*, No. 09 Civ. 3096, 2009 WL 3787209 (S.D.N.Y. Nov. 12, 2009), *aff'd*, 642 F.3d 321 (2d Cir. 2011). Familiarity with those opinions is assumed. The Court conducted a two-day nonjury trial, concluding on September 21, 2012. Below are the Court's findings of fact and conclusions of law as required under Fed. R. Civ. P. 52(a)(1).

## FINDINGS OF FACT

      This opinion relates only to those claims that have not settled since the bench trial's conclusion. First, the parties informed the Court by letter on December 14, 2012 that the Fund had "paid all claims listed in plaintiff's Exhibit 172, comprised of claims for services rendered after August 13, 2008 when the Fund was terminated from the MagnaCare network (the 'post-termination claims'), as well as the claims which were billed directly to the participants by Montefiore." And second, on February 7, 2013, the parties wrote that the Fund had paid "all of the claims for services rendered during the period prior to . . . August 13, 2008 when the Fund was terminated from the MagnaCare network (the 'pre-termination claims'), except for those claims that were denied for lack of pre-certification under the Terms of the Fund's plan of benefits." Accordingly, the remaining claims to be considered fall within two broad categories:

1

(1) two claims that were denied for lack of precertification and arising during the period that the Fund contracted with MagnaCare Administrative Services LLC; and (2) ten claims arising during the period that the Fund contracted with Horizon Healthcare of New York, Inc.

## A. The Parties

Montefiore is a licensed hospital services provider and is one of the largest teaching and research hospitals in the New York metropolitan area. The Fund is an employee benefits plan that provides hospital and medical coverage and other health benefits to covered employees. (Goodman Decl. ¶¶ 5–6.) Administration of the Fund is governed by a written benefits plan: the Local 272 Welfare Fund Summary Plan Description (the "SPD"). (*Id.* ¶ 8.) Covered medical expenses include expenses incurred for "[h]ospital services and supplies," "[d]octor visits," "[s]urgical services," "[l]ab tests," and other services. (Ex. P-166, at 272FUND-0004920 to 21.) Goodman has administered the Fund for more than 35 years. (Goodman Decl. ¶ 1.) While Goodman administers the day-to-day operations of the Fund, it is overseen by a Taft-Hartley set of trustees with an equal number from management and from the labor organization. With the authority of the Fund's Board of Trustees, Goodman exercises the Fund's discretionary authority under the Plan with respect to reviewing benefits claims and determining payments. (*Id.*) Thus, Goodman reviews every inpatient hospital claim involving a substantial payment. (Trial Tr. 144:12–18.)

## B. Agreements Between Montefiore, the PPOs, and the Fund

This dispute centers on Montefiore's allegations that the Fund, which is self-insured, failed to reimburse Montefiore at agreed-upon rates for services provided to patients covered by the Fund. Those rates were set out in contracts between Montefiore and two preferred provider organizations ("PPOs"): Horizon and MagnaCare. Healthcare providers like Montefiore contract directly with PPOs to join those PPOs' provider networks. By joining a PPO's network, these healthcare providers like Montefiore agree to reimbursement rates for services they provide to the PPO's clients. Typically these agreed rates are lower than a healthcare provider's standard rates. (Trial Tr. 38:11–21.) In some instances, the discounts for inpatient services are simply a percentage reduction of the provider's standard rates. For example, the agreement might entitle a provider to 80 percent of that provider's standard rates. In other instances, the provider and PPO agree upon a flat "case rate" for each inpatient admission based upon the type of service provided. (Trial Tr. 37:13–15.) In addition to the contracts between Montefiore and the PPOs,

the Fund also contracted, first with Horizon and then with MagnaCare, to gain access to those PPOs' provider networks and the accompanying discounted rates. (Goodman Decl. ¶¶ 10–11.) In general, these contracts bound the Fund to the rates agreed upon between the PPOs and Montefiore. (*Id.*)

### C. Horizon Claims

Montefiore's contract with Horizon as well as a separately executed "letter of intent" cover those claims arising through December 31, 2006. (*See* Defs.' Ex. 4; Ex. P-8; Goodman Decl. ¶ 10.) These documents together entitled Montefiore, as a member of Horizon's provider network, to reimbursement on a flat case rate basis. For example, the case rate for a "[v]aginal delivery mom and baby" was $8,060. (Ex. P-8, at MMC272 08103.) Montefiore's practice was to bill this service separately at $6,448 for the mother and $1,612 for the child. (*See, e.g.*, Ex. S-1, at MMC272 00901, 00913.) The Fund's contract with Horizon provided that the Fund would pay providers within Horizon's network "in accordance with the payment schedules provided by [Horizon] to [the Fund]." (Defs.' Ex. 4, at 272FUND-0004818.) And pursuant to Montefiore's contract with Horizon, Montefiore billed the Fund directly. (Goodman Decl. ¶ 10.)

Ten claims remain that arose during the period in which the Fund contracted with Horizon. Two of these claims are for services provided, respectively, from December 8, 2004 to December 11, 2004 and from December 19, 2005 to December 21, 2005. (Ex. S-1, at MMC272 00678, 00780.) For two additional claims, the Fund issued an explanation of benefits form ("EOB") explaining why the Fund refused to pay these claims. One of those EOBs, for services rendered in May 2006, states only that the Fund had already "[p]aid in full benefit to MagnaCare preferred provider." (Ex. S-6, at 272FUND-0003386.) While difficult to comprehend, this was the Fund's response even though this claim arose under the Horizon contract—which provided that payments should be made directly to Montefiore. (*See* Goodman Decl. ¶ 10; Defs.' Ex. 4, at 272FUND-0004818.) The Fund asserted that additional payments would not be made because of this purported payment to MagnaCare. Further, not even the Fund's contract with MagnaCare provided that the Fund should remit payment to the PPO, as opposed to Montefiore directly. (*See* Goodman Decl. ¶ 11 ("Once the SPD was applied, the Fund issued an EOB <u>to the provider</u> . . . either granting the claim and paying it or denying the claim in whole or in part." (emphasis added))).

3

And for the second claim for which an EOB denial was provided, the Fund first explained in that EOB that the "member [was] not eligible." (*See* Ex. S-1, at MMC272 00866; Ex. S-6, at 272FUND-0002815.) But the Fund eventually acknowledged that this member was in fact eligible and the patient "had an active policy." (Ex. P-65, at MMC272 00889–90.) Nevertheless, the Fund still did not pay this claim. Nor did the Fund issue another EOB or otherwise explain its decision. On the other hand, despite these failures to pay, Montefiore never availed itself of the appeals procedures outlined in the SPD or included with each EOB for any claim. (*E.g.*, Ex. S-6, at 272FUND-0003387; Ex. P-166, at 272FUND-0004973 to 4994.)

The six remaining claims arising while Horizon was the participating PPO involved three pairs of newborn babies and their mothers and the medical services provided in conjunction with childbirth. (Ex. S-1, at MMC272 00632, 00706, 00716, 00901, 00913, 00952.) For two of these mother/child pairs, the Fund acknowledged that the services provided were covered. First, the Fund acknowledged via telephone that one pair was "elig[ible] for service" and that their admissions had been precertified. (Ex. S-5b, at MMC272 00643, 00728.) And for a second pair, the Fund stated that "mom/baby" had been precertified and that the "baby [was] cov[ered] under mom." (*Id.* at MMC272 00911.) But for the third pair, the record does not indicate why benefits were not paid, as the Fund issued an EOB for neither the mother nor the child.

**D. MagnaCare Claims**

On January 1, 2007, the Fund's relationship with Horizon ended. In lieu of Horizon, the Fund contracted with MagnaCare to access its provider network. (*See* Ex. P-169.) In addition to Horizon's network, Montefiore was also a member of MagnaCare's provider network. But the contract between the Fund and Horizon differed in many respects from the contract between the Fund and MagnaCare. For instance, the Fund's contract with Horizon required Horizon to "ensure that the rates charged to [the Fund] . . . by Participating Providers shall not exceed [Horizon's] applicable Schedule of Payments." (Defs.' Ex. 4, at 272FUND-0004816.) But the contract with MagnaCare reserved for that PPO "the right to terminate or modify any provider agreement, <u>including the rates contained therein</u>, without notice" to the Fund. (Defs.' Ex. 5, at 272FUND-0004839 (emphasis added).)

Exercising this contractual right, MagnaCare designated the Fund as a non-preferred payor in MagnaCare's contract with Montefiore. (Swiss Decl. ¶¶ 9–10; *see* Ex. P-168, at MAGNA 0003–7.) Whether a payor is preferred or non-preferred affects the rate charged to that

4

payor.  (Ex. P-168, at MAGNA 0003–7; Swiss Decl. ¶ 8.)  For the most part, non-preferred payors were billed at 80 percent of Montefiore's standard rates.  (Ex. P-168, at MAGNA 0003–7; Swiss Decl. ¶ 8.)  By contrast, preferred payors generally paid a lower flat rate.  (Ex. P-168, at MAGNA 0003–7; Trial Tr. 37:4–38:21.)  But as the Fund was non-preferred, Montefiore billed the Fund at 80 percent of the hospital's standard rate.

According to Goodman, MagnaCare assured him that "the Fund would receive the best pricing that MagnaCare had available at all of the hospitals in the MagnaCare PPO."  (Goodman Decl. ¶ 11.)  Thus, Goodman believed that the Fund was entitled to the lower flat rate for preferred payors, rather than the higher 80 percent of Montefiore's charges.  (Trial Tr. 144:19–147:20.)  And acting on this belief, Goodman paid some of Montefiore's claims at this lower rate.  (*Id.*)  But the terms of the contract between Montefiore and MagnaCare do not designate the Fund as a preferred payor.  Indeed, that contract lists all of the preferred payors, as well as the "new payors" entitled to preferred rates.  The Fund does not appear on that list.  (*See* Ex. P-168, at MAGNA 0003.)

But the disputes over whether the Fund's relationship with MagnaCare entitled it to preferred rates have largely settled.  The two remaining unpaid claims arising during this period—which the parties agree involve Montefiore's right to payment under the SPD and ERISA—involve hospital admissions in 2008.  The Fund refused to pay these claims because these admissions were not precertified as the SPD required.  (Ex. S-6, at 272FUND-0001108, 0002885.)  Here, Alicare Medical Management provided precertification services.  (Ex. P-166, at 272FUND-0004919; Trial Tr. 192:21–25.)   By requiring precertification through Alicare before admission to a hospital, the Fund hoped to "reduce unnecessary hospitalization" and "promote the use of safe, cost-effective alternatives to hospitalization."  (Goodman Decl. ¶ 17.)  For example, if Alicare determined that a procedure was not medically necessary, the Fund was not required to pay for that procedure.  (*Id.*)  And indeed, the SPD expressly does not cover "[t]reatment, services[,] . . . equipment[,] or supplies (including prosthetics and orthotic appliances) that are not medically necessary (in the opinion of Horizon, Alicare, or the Fund)."  (Ex. P-166, at 272FUND-0004931.)  On the contrary, the SPD indicates that coverage is available only on the condition that medical services and supplies "are medically necessary."  (*Id.* at 272FUND-0004920.)  Different timelines apply for emergency and nonemergency admissions, but the SPD requires that the patient contact Alicare for all hospital admissions at some point.

(*Id.* at 272FUND-0004919 to 20.) Failure to contact Alicare would result in "a denial of benefits." (*Id.* at 272FUND-0004920.)

Montefiore concedes that Alicare did not precertify these two admissions. Nevertheless, Montefiore argues that the services provided during those hospital stays did not require precertification. In Montefiore's view, the SPD required precertification of only the admissions themselves, not the services provided during these hospital stays. Such disputes over when the SPD requires precertification require an interpretation of the SPD's terms. And in this regard, the Fund has reserved for itself substantial discretion. Per the SPD, the Fund's Board of Trustees and its designees "ha[ve] the exclusive right, power and authority, in its sole and absolute discretion, to administer, apply and interpret the Plan . . . and to decide all matters arising in connection with the operation or administration of the Fund or Trust." (Defs.' Ex. 2, at 272FUND-0005000.) This "absolute discretionary authority" includes "[d]ecid[ing] questions, including legal or factual questions, relating to the calculation and payment of benefits under the Plan," "[p]rocess[ing] and approv[ing] or deny[ing] benefit claims," and "[d]etermin[ing] the standard of proof required in any case." (*Id.* at 272FUND-0005000 to 5001.)

E.  Post-MagnaCare Claims

In an effort to remedy what it viewed as overbilling, the Fund began requesting Montefiore's charge description master (the "chargemaster"). A hospital's chargemaster lists the amounts that hospital charges for the medical services it provides. (Swiss Decl. ¶ 4.) Montefiore considers its chargemaster proprietary, and is loathe to disclose it to outside parties. (*Id.* ¶ 5.) Yet because the Fund viewed the chargemaster as necessary to review the amounts Montefiore claimed the Fund owed, the Fund refused to pay any claims without it. (Goodman Decl. ¶¶ 40–42.) This impasse resulted in Montefiore terminating the Fund from its list of acceptable payors under Montefiore's contract with MagnaCare. (Del Casale Decl. ¶ 13.) Accordingly, as of August 2008, the Fund's beneficiaries were no longer entitled to any discount from Montefiore by virtue of the Fund's contract with MagnaCare. (Goodman Decl. ¶ 12.)

Despite this termination, Montefiore still admitted some Fund beneficiaries for services. (*See* Ex. P-172.) And Montefiore continued to submit bills for those services to MagnaCare, which in turn submitted discounted bills to the Fund. (Trial Tr. 52:19–53:4.) Montefiore also began billing some Fund beneficiaries directly. (*Id.*) When these beneficiaries contacted the Fund about these bills, the Fund advised that the beneficiaries would have to request medical

6

records from Montefiore before the Fund could take action.  (Ex. S-7, at MMC272 00968–69; Trial Tr. 113:14–114:10.)  And because neither the Fund nor the beneficiaries were paying Montefiore, the hospital brought suit on these claims for unjust enrichment and tortious interference with contract.  But as explained above, the Fund has since settled all claims arising following Montefiore's termination of the Fund as an acceptable payor.  Accordingly, I need not consider these claims further.

## CONCLUSIONS OF LAW

### A.  Montefiore's ERISA Claims:  The MagnaCare Claims

I examine first Montefiore's two express ERISA § 502(a) claims.  Under ERISA § 502(a), a beneficiary may sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  Montefiore, as the assignee of the beneficiaries' claims, urges that the Fund failed to reimburse expenses related to covered services.  Those services—including lab analyses, diagnostic tests, and provision of medical supplies—were provided in relation to two hospital admissions.  And indeed, the SPD provides that covered medical expenses include "[h]ospital services and supplies," "[d]iagnostic x-rays and other imaging services," and "[l]ab tests."  (Ex. P-166, at 272FUND0004920–21.)  The Fund denied reimbursement because the beneficiaries failed to precertify these services.

As explained above, these claims arose during the period in which the Fund contracted with MagnaCare.  Because the Fund denied these claims for lack of precertification, liability "implicate[s] coverage and benefits established by the terms of the ERISA benefit plan." *Montefiore Med. Ctr.*, 642 F.3d at 331.  Accordingly, these claims turn on Montefiore's right to payment under the SPD.  But with certain exceptions, ERISA claims like these are subject to ERISA's exhaustion requirements.  *Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 446 (2d Cir. 2006).  And there is no dispute that Montefiore did not pursue its administrative options as laid out in the SPD and communicated with each denial.  Yet despite failing to exhaust, Montefiore nevertheless argues that it should be deemed to have exhausted such remedies because the Fund failed to comply with ERISA regulations.

Specifically, Montefiore argues that the Fund's insufficient denial notifications, embodied in the Fund's EOBs, excuse any ERISA exhaustion requirements.  And indeed, federal regulations require that denial notifications, *inter alia*, "[r]eference . . . the specific plan

provisions on which the determination is based." 29 C.F.R. § 2560.503-1(g)(1)(ii). Failure to "follow claims procedures consistent with the requirements of [§ 2560.503-1]" results in claimants being "deemed to have exhausted the administrative remedies under the plan . . . on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim." § 2560.503-1(l). For both claims at issue here, the Fund stated only that "pre-certification [was] required" when it denied these claims. (Ex. S-6, at 272FUND-0001108, -0002885.) Nowhere did the Fund explain which SPD provision permitted these denials. Accordingly, claimants—including Montefiore—are deemed to have exhausted their administrative remedies, and the Fund's affirmative defense on this ground must fail. § 2560.503-1(l); *see Haag v. MVP Health Care*, 866 F. Supp. 2d 137, 143–44 (N.D.N.Y. 2012) (deeming administrative remedies exhausted where plan did not follow requirements of § 2560.503-1(g)); *Scarangella v. Grp. Health Inc.*, No. 05 Civ. 5298, 2009 WL 764454, at *11 (S.D.N.Y. Mar. 24, 2009) ("'Substantial compliance' with the DOL regulations is not enough; close adherence to these provisions is required." (citing *Eastman Kodak Co. v. STWB, Inc.*, 452 F.3d 215, 222 (2d Cir. 2006))).

While I therefore reach the merits of Montefiore's ERISA claims, I am to review the Fund's determinations under the arbitrary and capricious standard only. As explained above, the Fund had "absolute discretionary authority" to interpret the SPD and determine all benefits questions. (Defs.' Ex. 2, at 272FUND-0005000.)

Given this standard, I conclude that the Fund's determination with respect to these claims was not arbitrary and capricious. "Denials may be overturned as arbitrary and capricious only if the decision is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002) (internal quotation marks omitted) (quoting *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999)). But where the dispute involves interpretation of plan provisions, "the administrator's interpretation must be allowed to control." *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 132 (2d Cir. 2008). Only where the Fund "imposes a standard not required by the plan's provisions, or interprets the plan in a manner inconsistent with its plain words" may courts deem the Fund's actions arbitrary and capricious. *Id.* at 133 (quoting *Pulvers v. First UNUM Life Ins. Co.*, 210 F.3d 89, 93 (2d Cir. 2000)).

Here, Montefiore does not dispute that no one consulted Alicare in connection with either of these two claims. Instead, Montefiore relies on its own interpretation of the precertification requirement. But the Fund's interpretation that precertification was required even for those services provided in connection with these two hospital stays is not inconsistent with the SPD's terms. First, the SPD makes clear that hospital admissions must be precertified. Under the SPD, failure to precertify is a legitimate ground for claim denial. Second, the SPD states that if Alicare determines that a procedure is not medically necessary, it is not covered under the SPD. And third, the SPD expressly provides coverage only for "services and supplies [that] are medically necessary." (Ex. P-166, at 272FUND-0004920.)

Montefiore's interpretation of these clauses—that services and supplies provided during a hospital stay do not require precertification—would severely limit Alicare's ability to determine medical necessity. Indeed, Alicare would rarely have the opportunity to determine medical necessity other than for the hospital admission itself. Given that the SPD envisions a medical necessity determination for all services rendered, it is not clearly erroneous for the Fund to conclude that precertification is required even for those medical services and supplies rendered during hospital stays. Using accepted standards, I must defer to the Fund's interpretation unless it is inconsistent with the SPD's terms and I conclude that it is not and the Fund was not arbitrary and capricious when it denied these claims for failure to precertify. Accordingly, Montefiore's two ERISA claims during the MagnaCare period must fail. Montefiore's request for $9,632.23 arising from these two claims therefore is denied.

## B. The Horizon Claims

### 1. Time-Barred Claims

I turn next to Montefiore's ten claims for breach arising during the period that Horizon was the participating PPO. The parties dispute the extent to which ERISA § 514(a)'s express preemption clause, sometimes called conflict preemption, nullifies these claims or renders them otherwise dismissable. ERISA § 514(a) preemption is distinct from complete preemption. Sometimes called conflict preemption, ERISA § 514(a) preemption is a complete defense to state law claims. *See Bloomfield v. MacShane*, 522 F. Supp. 2d 616, 622 (S.D.N.Y. 2007) (distinguishing preemption doctrines and noting that "preemption under ERISA § 514(a) serves as a defense to a state law claim"). On the other hand, complete preemption provides a basis for federal jurisdiction over certain claims invoking state law. *Montefiore Med. Ctr.*, 642 F.3d at

327 ("Complete preemption permits removal of a lawsuit to federal court based upon the concept that where there is complete preemption, only a federal claim exists." (quoting *In re WTC Disaster Site*, 414 F.3d 352, 327–73 (2d Cir. 2005))).

But two of these claims, regardless whether express or complete preemption applies, are time-barred under the Plan's provisions. Here, the SPD's express terms determined the time within which a claimant must bring suit. Parties to a contract, regardless whether ERISA governs that contract, are permitted to shorten the limitations period in which a party may sue for breach. *See Burke v. PriceWaterHouseCoopers LLP Long Term Disability Plan*, 572 F.3d 76, 78, 81 (2d Cir. 2009) (upholding ERISA plan's shortened limitations period); *Corbett v. Firstline Sec., Inc.*, 687 F. Supp. 2d 124, 128 (E.D.N.Y. 2009) ("[C]ourts applying New York law will enforce a shortened statute of limitations when it is reasonable and agreed to by contract."). Thus, the SPD's time bar controls and "[n]o lawsuit may be started more than 3 years after the end of the year in which medical . . . services were provided." (Ex. P-166, at 272FUND-0004994.) Medical services for two of these claims were completed, respectively, on December 11, 2004 and December 21, 2005. (Ex. S-1, at MMC272 00678, MMC272 00780.) Because this litigation commenced on March 11, 2009, claims for services rendered before December 31, 2005 are time-barred. Accordingly, these two claims are dismissed.

### 2. Defining the Expressly Denied Claims

The parties next dispute whether the remaining claims are preempted. To determine whether a claim is preempted, I must determine the nature of the actual dispute regarding each claim. For example, claims challenging Montefiore's right to payment, as opposed to the amount, may be subject to complete preemption. *Montefiore Med. Ctr.*, 642 F.3d at 331. Here, the Fund issued EOBs explaining the reason the Fund denied the claim for only two of the remaining eight timely Horizon claims. One of these denials states only that the Fund had already "[p]aid in full benefit to MagnaCare preferred provider." (Ex. S-6, at 272FUND-0003386.) As the Fund acknowledged that this patient was covered under the SPD, only the amount of payment is disputed. Therefore, this claim is not completely preempted. Accordingly, I will analyze it as a non-ERISA claim. *See infra*.

And with regard to the second Horizon claim for which an EOB denial was issued, the Fund's initial explanation for nonpayment was that the "member [was] not eligible." (Ex. S-6, at 272FUND-0002815.) But as explained above, the Fund eventually acknowledged that this

member was in fact covered under the plan.  Nevertheless, the Fund still did not pay this claim.  Because the Fund apparently denied the claim without explanation, I will treat this claim like the balance of the Fund's denials without explanation, to which I now turn.

### 3. Denials Without Explanation

Including the claim described above, three of the Horizon claims were not expressly denied through issuance of an EOB.  (Ex. S-1, at MMC272 00706, 866, 952.)  Because the right to payment on these claims has not yet been established, determining whether that right exists requires deciding the nature of the medical benefits received and where those benefits fit within the scope of the Plan.  Such claims "implicat[ing] coverage and benefits established by the terms of the ERISA benefit plan" are completely preempted.  *See Montefiore Med. Ctr.*, 642 F.3d at 331 (contrasting completely preempted claims with those "where the basic right to payment has already been established and the remaining dispute only involves obligations derived from a source other than the Plan").

For these claims, "[t]he Court has to decide whether to recharacterize the state law claims as a claim pursuant to section 502(a)(1)(B) under ERISA . . . or to dismiss [those claims]." *N. Shore - Long Island Jewish Health Sys., Inc. v. Local 272 Welfare Fund*, No. 12 Civ. 1056, 2013 WL 174212, at *7 (S.D.N.Y. Jan. 15, 2013).  Because trial has already been had on these issues, judicial resources would be wasted were I simply to dismiss Montefiore's state law claims rather than interpret them as ERISA claims.  Accordingly, I will analyze those completely preempted breach of contract claims as ERISA § 502(a)(1)(B) claims in lieu of dismissal.  *See Schultz v. Tribune ND, Inc.*, No. 10 Civ. 2652, 2011 WL 4344168, at *6 n.5 (E.D.N.Y. Sept. 14, 2011) ("What was a state claim for breach of contract becomes a federal claim for the enforcement of contractual rights under § 502(a)(1)(B)." (quoting *Darcangelo v. Verizon Commc'ns, Inc.*, 292 F.3d 181, 195 (4th Cir. 2002)).

Like the express ERISA claims above, completely preempted ERISA claims are also generally subject to an exhaustion requirement.  But for the same reason that Montefiore is deemed to have exhausted administrative remedies on its express ERISA claims, the hospital is deemed to have exhausted its administrative remedies here.  For the single claim that the Fund initially denied through an EOB, that notice was deficient because it failed to comply with the requirements of 29 C.F.R. § 2560.503-1(g)(1).  Indeed, the Fund admitted that this EOB was erroneous.  Accordingly, the Fund never communicated the true reason for the denial.  Similarly,

for the two claims where there is no evidence that the Fund ever sent an EOB or otherwise paid benefits, those claims are similarly "deemed denied with administrative remedies exhausted." *Burke*, 572 F.3d at 80. Accordingly, Montefiore was not required to avail itself of the Fund's administrative remedies before bringing suit on any of these three claims. *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 624 (2d Cir. 2008); § 2560.503–1(l).

Review of these three claims in federal court is thus appropriate. But whether arbitrary and capricious or *de novo* review applies to such "deemed denied" claims is an open question. *Krauss*, 517 F.3d at 624. Nevertheless, under either standard, the Fund's failure to explain its reasoning for these three denials requires that I remand these claims to the Fund for a full and fair review. *Merrill v. Hartford Life & Acc. Ins. Co.*, 503 F. Supp. 2d 531, 537 (D. Conn. 2007) (remand appropriate even under *de novo* review where court could not "determine whether [the denial] decision was ultimately incorrect"). Montefiore has not shown that "no new evidence could produce a reasonable conclusion permitting denial of [these] claim[s]." *Palmiotti v. Metro. Life Ins. Co.*, 423 F. Supp. 2d 288, 301 (S.D.N.Y. 2006) (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995)). Accordingly, the appropriate remedy is to remand these claims to the Fund to explain fully its reasoning or in the alternative pay the disputed claims, and do so within 60 days from the date hereof.

### 4. Denials Where the Fund Admitted Coverage

The five remaining Horizon claims were not paid despite the Fund admitting that the patients were covered under the SPD. First, the Fund acknowledged via telephone that two of these patients were "elig[ible] for service" and that Alicare had precertified their admission. (Ex. S-5b, at MMC272 00643, 00728.) Similarly, for two claims involving services related to a 2006 childbirth, the Fund stated that Alicare had precertified "for mom/baby" and "baby cov[ered] under mom." (Ex. S-5b, at MMC272 00911.)

And as described above, one of the Fund's denials stated that the Fund had "paid in full to MagnaCare," thus implicitly acknowledging that the services rendered to that patient were covered under the Plan. (Ex. S-6, at 272FUND-0003386.) Indeed, that claim arose under the Fund's contract with Horizon, yet the Fund claims to have paid MagnaCare. And neither the Horizon contract nor the Fund's contract with MagnaCare provided that the Fund should remit payment to the PPO rather than directly to Montefiore. Without any evidence that the Fund paid the hospital, Montefiore's claim here survives.

Because the Fund therefore has admitted coverage on these five claims, the only remaining dispute is the amount owed to Montefiore. These claims therefore are not completely preempted. *Montefiore Med. Ctr.*, 642 F.3d at 331. But although the SPD thus entitled Montefiore to reimbursement on these claims, the Fund nevertheless argues that these claims should be dismissed because they are preempted under express preemption principles pursuant to ERISA § 514(a). *See, e.g.*, *Watson v. Consol. Edison of N.Y.*, 594 F. Supp. 2d 399, 409 (S.D.N.Y. 2009) (dismissing common law claims based on ERISA § 514(a) preemption).

I disagree. While ERISA § 514(a) preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan," *Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 113 (2d Cir. 2008) (quoting 29 U.S.C. § 1144(a)), courts have declined to interpret this language with "uncritical literalism." *Plumbing Indus. Bd., Plumbing Local Union No. 1 v. E. W. Howell Co., Inc.*, 126 F.3d 61, 66 (2d Cir. 1997) (quoting *Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 325 (1997)). Indeed, courts "must begin with the 'starting presumption that Congress does not intend to supplant state law.'" *Id.* at 66–67 (quoting *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995)). Thus, a state law that does not expressly refer to ERISA faces ERISA § 514(a) express preemption only if that law "has a clear 'connection with' a plan in the sense that it 'mandate[s] employee benefit structures or their administration' or 'provid[es] alternative enforcement mechanisms.'" *Id.* at 67 (alterations in original) (quoting *Travelers Ins. Co.*, 514 U.S. at 658). Regarding state common law claims—like the contract claims here—"ERISA preempts those that seek 'to rectify a wrongful denial of benefits promised under ERISA-regulated plans, and do not attempt to remedy any violation of a legal duty independent of ERISA.'" *Paneccasio*, 532 F.3d at 114 (quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 214 (2004)).

The five remaining contract claims here do not run afoul of ERISA § 514(a) and therefore are not expressly preempted. First, although complete preemption and express preemption under ERISA § 514(a) are analytically distinct, it bears noting that these claims could not have been brought as ERISA claims. *See Montefiore Med. Ctr.*, 642 F.3d at 332 (claims concerning "rate or execution of payment" are "not . . . colorable claim[s] pursuant to § 502(a)(1)(B)"). Thus, these claims are not benefits claims and do not seek to vindicate any right protected by ERISA. *Cf. Paneccasio*, 532 F.3d at 114 (ERISA preempts contract claims

13

that seek to remedy "denial of benefits under [ERISA] Plan"). Accordingly, these claims cannot constitute an alternative enforcement mechanism in lieu of an ERISA cause of action.

Nor does requiring the Fund to pay the amount it is contractually obligated to pay otherwise provide a sufficient "connection" with an ERISA plan to render those claims preempted. *See Travelers Ins. Co.*, 514 U.S. at 659–62 ("[A]n indirect economic influence . . . does not bind plan administrators to any particular choice" and therefore state laws with "indirect economic effect[s]" are not preempted); *cf. Blue Cross of Cal. v. Anesthesia Care Assocs. Med. Grp., Inc.*, 187 F.3d 1045, 1049, 1054 (9th Cir. 1999) (ERISA § 514(a) did not preempt dispute over changes in fee schedules between health care providers and ERISA plan provider "because the [health care] Providers' claims arise from contracts" between the health care providers and the plan provider). Instead, as this Circuit has explained, amount-of-payment claims like those here are brought pursuant to "independent contractual obligations." *Montefiore Med. Ctr.*, 642 F.3d at 331. Those obligations arise from Horizon's contract with the Fund allowing the Fund access to Horizon's PPO network at discounted rates, and Montefiore's contract with Horizon establishing the rates to which Montefiore was entitled for medical services. These contracts are independent of ERISA. And because the Fund has admitted coverage, it is not necessary to construe the terms of the ERISA plan—embodied in the SPD—to determine the proper rate of payment. The lack of a sufficient relationship between Montefiore's claims here and the SPD to warrant ERISA § 514(a) preemption is thus apparent.

Having determined that these five claims are not expressly preempted, I also conclude that the Fund did not pay these claims as required under the contracts. The four claims involving childbirth are subject to the rates defined in Horizon's contract with Montefiore. The evidence indicates that the Fund also does not dispute the amount of the fifth claim. Instead, the Fund explained that it had already "paid [that claim] in full" to MagnaCare. Because the Fund does not dispute the amount owed, it is this amount to which Montefiore is entitled. Thus, based on Montefiore's patient records for these five claims, the Fund owes Montefiore $42,698.03. (Ex. S-1, at MMC272 00632 ($1,612.00); *id.* at MMC272 00693 ($26,578.03); *id.* at MMC272 00716 ($6,448.00); *id.* at MMC272 00901 ($1,612.00); *id.* at MMC272 00913 ($6,448.00).)

## CONCLUSION AND ORDER OF JUDGMENT

For the foregoing reasons, judgment will be entered in Montefiore's favor against both the Fund and Goodman, in his capacity as Fund Manager, in the amount of $42,698.03. Three

claims are remanded to the Fund for reconsideration and resolution within 60 days. (Ex. S-1, at MMC272 00706, 866, 952.) The Clerk of the Court is instructed to close this case and remove it from my docket.

SO ORDERED.

Date: 6/25/13
New York, New York

_____
HAROLD BAER, JR.
United States District Judge